IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-02600-CMA-KLM

EUGENE CHRISTENSON, and
SHARON CHRISTENSON,

       Plaintiffs,

v.

CITIMORTGAGE, INC.,

       Defendant.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

       This matter is before the Court on Defendant's **Motion to Dismiss Count VI in Plaintiff's Third Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6)** [#54][1] (the "Motion"). Plaintiffs filed a Response [#56] in opposition to the Motion, and Defendant filed a Reply [#57]. The Motion is ripe for review. Pursuant to 28 U.S.C. § 636(b) and D.C.COLO.LCivR 72.1(c), the Motion has been referred to the undersigned for recommendation [#55]. The Court has reviewed the entire docket, and the applicable law, and is sufficiently advised in the premises. For the reasons set forth below, the Court respectfully **RECOMMENDS** that the Motion [#54] be **DENIED**.

## I. Background

       Plaintiffs initiated this action on October 1, 2012. *Compl.* [#1]. Plaintiffs primarily

_____

[1] "[#54]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Recommendation.

challenge Defendant's attempted foreclosure of their real property located in Grand Junction, Colorado (the "Property"). *Third Am. Compl.* [#53] ¶ 3. Defendant is a mortgage servicer and holds the promissory note and deed of trust securing the mortgage on Plaintiffs' property. *Id.* ¶¶ 2-3. In short, as relevant to the present Motion, Plaintiffs assert that Defendant failed to engage in appropriate loss mitigation action with respect to Plaintiffs' mortgage when Plaintiffs fell behind on monthly payments.

In the present Motion [#54], Defendant seeks dismissal of Plaintiff's Count VI asserted under the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. §§ 6–1–101 to –115. As relevant to this claim, on June 17, 2013, the undersigned recommended dismissal of this cause of action because Plaintiffs did not sufficiently allege an unfair or deceptive act by Defendant. *Recommendation* [#30] at 33-36. Plaintiffs did not file an objection to the Recommendation, and the District Judge adopted the Recommendation and dismissed the cause of action on September 18, 2013. *Order* [#34]. The District Judge also provided Plaintiffs with the opportunity to file an Amended Complaint, which they timely did on October 18, 2013. *Order* [#34]; *Second Am. Compl.* [#36]. The Amended Complaint included an amended claim for violation of the CCPA.

For the second time, Defendant filed a Motion to Dismiss [#37] the amended CCPA claim. In determining whether Plaintiffs' second attempt to state a CCPA claim would survive under Rule 12(b)(6), the District Judge held:

> Plaintiffs have advanced a hydra-headed theory of the Defendant's deceptive practices that this Court does not comprehend.
>
> The Court has lost count as to how many different potential aspects there are to Plaintiffs' theory of Defendant's deception. First, Defendant is deceptive by employing maneuvers "both by affirmative statement and omission, that enables [sic] it to take people's homes, utilizing non-judicial foreclosure, when

the contract does not entitle it to do so." Another aspect of this theory is Defendant's deceiving of the "FHA into thinking it engages in loss mitigation as required by FHA regulations," which also requires Defendant to "solicit and receive applications for loss mitigation which requires deceiving consumers into believing they would be fairly evaluated so that homeowners like Plaintiffs will take the time and energy to send complex but useless applications to Defendant." Finally, as part of this scheme, "Defendant had to deceive the trustee into believing it is entitled to foreclose for the trustee to act."

The allegations recited in the above paragraph are insufficient "to ensure that a defendant is placed on notice of [its] alleged misconduct sufficient to prepare an appropriate defense."[2] . . .

This Court will permit Plaintiffs one last opportunity to cure this defect. If Plaintiffs wish to raise this claim again in another amended complaint, they must:

1. Identify the legal obligations that apply to Defendant and are relevant to this claim.

2. Point to specific statutory or regulatory provisions that give rise to these legal obligations and explain concretely exactly what Defendant must allegedly do to comply with those provisions.

3. Narrate the circumstances under which Defendant violated these legal obligations when administering Plaintiffs' loan (if applicable). This narration should include approximate dates, approximate locations, key actors, and sufficient additional context (i.e., exactly what was said, how it was a misrepresentation, etc.).

4. Provide sufficient detail and factual support explaining how Defendant's misrepresentations are seemingly systemic or at least apply to large numbers of Coloradoans. This Court is particularly concerned about the dearth of factual support related to Plaintiffs' claims of Defendant's systemic violations.

---

[2]    Further, the above-quoted allegations, which the Court has pulled from Plaintiffs' Response to the Motion to Dismiss, present what is only a marginally more coherent narrative of the more wide-ranging deceptive scheme alleged in the second amended complaint itself. In short, much more road-mapping must be done by Plaintiffs on this claim—in the operative pleading rather than in briefing—before they are entitled to discovery on it. [footnote in original]

As a concrete example of how Plaintiffs' claim in present form is too vague, consider the following statement in the Response to the Motion to Dismiss, where Plaintiffs argue that "Defendant is aware of the exact language used in the correspondence to trustees, in reporting to FHA, and in contacts with Courts and to borrowers." Plaintiffs should set forth the exact language used in the correspondence, rather than providing a vague allegation that Defendant already knows what this is about and is merely hiding the ball.

*Order* [#50] at 11-14 (internal citations and footnotes omitted). As permitted, Plaintiffs filed a Third Amended Complaint with respect to their CCPA claim. *Third Am. Compl.* [#53]. The present Motion [#54] seeks to dismiss this claim for the third time in this litigation.

## II. Standard of Review

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994); Fed R. Civ. P. 12(b)(6) (A complaint may be dismissed for "failure to state a claim upon which relief can be granted."). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1236 (10th Cir. 1999) (citation omitted). To withstand a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007) ("The complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support the plaintiff's allegations." (quoting *Twombly*, 550 U.S. at 570)). "A claim has facial

-4-

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks and citation omitted).

The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a factual allegation has been stated, "but it has not shown that the pleader is entitled to relief," as required by Federal Rule of Civil Procedure 8(a). *Iqbal*, 556 U.S. at 679 (quotation marks and citation omitted).

## III.  Analysis

The CCPA was enacted to provide a remedy "against consumer fraud." *W. Food Plan, Inc. v. Dist. Ct.*, 598 P.2d 1038, 1041 (Colo. 1979). To state a private claim for relief under the CCPA, Plaintiffs must allege:

> (1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff[s] suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff[s'] injury.

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo. 2003) (citing *Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998)). If all elements of a CCPA claim are not properly plead, the claim fails as a matter of law. *HealthONE, Inc. v.*

*UnitedHealth Grp., Inc.*, 805 F. Supp. 2d 1115, 1120 (D. Colo. 2011).  A CCPA claim must be pled with particularity under Fed. R. Civ. P. 9(b).  *Jacob v. Credit Suisse First Boston*, No. 11-cv-00042-CMA-KLM, 2011 WL 4537007, at *5 (D. Colo. Sept. 30, 2011) (citing *Duran v. Clover Club Foods Co.*, 616 F. Supp. 790, 793 (D. Colo.1985)).

Defendant argues that Plaintiffs' claim fails as a matter of law because (1) it is barred by the economic loss rule; (2) Plaintiffs have not alleged an unfair or deceptive trade practice; (3) the CCPA claim is a disguised breach-of-contract claim; (4) Plaintiffs have not alleged a significant public impact; (5) Plaintiffs have not alleged detrimental reliance; and (6) Plaintiffs have not alleged damage to a legally protected interest. *Motion* [#54] at 5-11. The Court addresses each argument in turn.

**A.    Economic Loss Rule**

Defendant argues that "[b]ecause the alleged obligation to evaluate loss mitigation alternatives arises under the Deed of Trust, Plaintiffs' CCPA claim is barred by the economic loss rule." *Id.* at 11.

Whether Colorado's economic loss rule bars a claim is a question of law. *Standard Bank, PLC v. Runge, Inc.*, 443 F. App'x 347, 349 (10th Cir. 2011).  Pursuant to Colorado law, the economic loss rule provides that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Id.* at 349-50.  The stated purpose of the economic loss rule is three-fold: "(1) to maintain a distinction between contract and tort law; (2) to enforce expectancy interests of the parties so that they can reliably allocate risks and costs during their bargaining; and (3) to encourage the parties to build cost considerations into the contract because they will not be able to recover

economic damages in tort." *Id.* at 351 (citing *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo. 2004)).

In determining whether the economic loss rule is applicable, the Court must focus "on the source of the duty alleged to have been breached." *Standard Bank, PLC*, 443 F. App'x at 351.  A duty arising in tort must be "sufficiently independent of the contract to preclude application of the economic loss rule." *Id.*  A tort duty that is sufficiently independent of the contract at issue must meet two conditions: "[f]irst, the duty must arise from a source other than the relevant contract[;] [s]econd, the duty must not be a duty also imposed by the contract." *Registry Sys. Int'l, Ltd. v. Hamm*, No. 08-cv-00495-PAB-MJW, 2010 WL 326327, at *10 (D. Colo. Jan. 20, 2010) (citing *Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 573 F.3d 947, 962 (10th Cir. 2009)).  Broadly, "[t]ort obligations generally arise from duties imposed by law . . . without regard to any agreement or contract," and "[c]ontract obligations, on the other hand, 'arise from promises made between parties [to] allocate risks and costs during bargaining.'" *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1162 (10th Cir. 2008) (citing *Town of Alma v. Azco Constr., Inc.*, 10 P.3d 1256, 1262 (Colo. 2000)).

The parties in this case ultimately appear to agree that the economic loss rule is inapplicable here.  *Motion* [#54] at 11; *Response* [#56] at 8-9; *Reply* [#57] at 7-8.  To determine whether the evaluation and implementation of loss mitigation options is a tort duty that is sufficiently independent from the contract, the Court first determines whether the duty arises from a source other than the relevant contract.  *Registry Sys. Int'l, Ltd.*, 2010 WL 326327, at *10.  In this case, Defendant's duty arises from regulations of the Department of Housing and Urban Development ("HUD").  *Order* [#34] at 3.  These

regulations "have the effect of law." *Id.* (citation omitted).  The regulations include Defendant's duty to mitigate loss.  *See id.* at 3-4 (reciting the language of various relevant HUD regulations).  Thus, the Court finds that Defendant's duty arises from a source other than the relevant contract.

Second, the Court must determine whether the duty is a duty also imposed by the contract. *Registry Sys. Int'l, Ltd.*, 2010 WL 326327, at *10.  The District Judge has already determined in this case that compliance with HUD regulations is a condition precedent to Defendant's ability to accelerate and foreclose on the debt.  *Order* [#34] at 14.  To the extent that the District Judge has already addressed Defendant's duty to comply with HUD regulations, her ruling forecloses Defendant's assertion that its duty to explore loss mitigation arises solely out of the contract and could be used as the basis for an affirmative breach of contract claim. *Id.* at 15.  Further, a review of the Note [#54-1] and Deed of Trust [#54-2] does not reveal any explicit provisions requiring Defendant to engage in loss mitigation, and the parties do not assert, either in the Proposed Third Amended Complaint or in the briefing on the present Motion [#54], that any particular provision should be interpreted as requiring such.[3]  Thus, the Court finds that loss mitigation is not a duty that

---

[3] When considering a motion to dismiss, the Court must usually disregard facts supported by documents other than the complaint unless the Court first converts the motion to dismiss into a motion for summary judgment. *Jackson v. Integra Inc.*, 952 F.2d 1260, 1261 (10th Cir. 1991).  The Court may consider documents outside of the complaint on a motion to dismiss in three instances, however.  First, the Court may consider outside documents pertinent to ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1). *Pringle v. United States*, 208 F.3d 1220, 1222 (10th Cir. 2000).  Second, the Court may consider outside documents subject to judicial notice, including court documents and matters of public record. *Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006).  Third, the Court may consider outside documents that are both central to the plaintiff's claims and to which the plaintiff refers in his complaint. *GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir. 1997).  The Note [#54-1] and the Deed of Trust [#54-2] may appropriately be considered by the Court in making its Recommendation on the pending Motion based on this third exception.

is also imposed by the contract. *Cf. Nero v. Am. Family Mut. Ins. Co.*, No. 11-cv-02717-PAB-MJW, 2013 WL 5323147, at *6 (D. Colo. Sept. 23, 2013) (holding, under different circumstances, that the plaintiff's CCPA claim arose out of duties imposed by the contract).

Because both conditions have been met, the Court finds that the tort duty here alleged, i.e., violation of the CCPA based on Defendant's alleged failure to appropriately mitigate loss, is sufficiently independent of the contract at issue, i.e., the Deed of Trust. *See Registry Sys. Int'l, Ltd.*, 2010 WL 326327, at *10.  Thus, because the tort duty is "sufficiently independent of the contract," use of the economic loss rule is precluded. *Standard Bank, PLC*, 443 F. App'x at 351.

Accordingly, the Court **recommends** that the Motion [#56] be **denied** with respect to Defendant's argument regarding the economic loss rule.

**B.    Unfair or Deceptive Trade Practice**

The Court next addresses Defendant's argument that Plaintiffs failed to allege an unfair or deceptive practice. *Motion* [#54] at 6-7; *Reply* [#57] at 5-7.  Plaintiffs assert that deceptive mortgage servicing through falsely offering loss mitigation exploration is the basis for their CCPA claim. *Response* [#56] at 2-4.  Defendant argues that Plaintiffs have failed to show that "the alleged letters regarding various loss mitigation options under FHA regulations" are a "good" or "service" under the CCPA. *Reply* [#57] at 5.

"A deceptive trade practice requires a showing that the defendant knowingly made a misrepresentation or a false representation that had the capacity to deceive and that either 'induce[d] a party to act, refrain from acting, or ha[d] the capacity or tendency to attract consumers.'" *Dawson v. Litton Loan Servicing, LP*, No. 12-cv-01334-CMA-KMT,

2014 WL 4821373, at *5 (D. Colo. Sept. 29, 2014) (quoting *HealthONE of Denver, Inc. v. UnitedHealth Grp., Inc.*, 805 F. Supp. 2d 1115, 1120 (D. Colo. 2011)).   Here, in order to demonstrate a deceptive trade practice, Plaintiffs must provide allegations sufficient to demonstrate that Defendant failed to comply with required loss mitigation guidelines or that Defendant misrepresented that it was complying with these guidelines.  *See, e.g.*, *Dawson*, 2014 WL 4821373, at *5.

Plaintiffs direct the Court's attention to the following HUD regulations:

> Mortgagees must consider the comparative effects of their elective servicing actions, and must take those appropriate actions which can reasonably be expected to generate the smallest financial loss to the Department.  Such actions include, but are not limited to, deeds in lieu of foreclosure under § 203.357, pre-foreclosure sales under § 203.370, partial claims under § 203.414, assumptions under § 203.512, special forbearance under §§ 203.471 and 203.614, and recasting of mortgages under § 203.616.  HUD may prescribe conditions and requirements for the appropriate use of these loss mitigation actions, concerning such matters as owner-occupancy, extent of previous defaults, prior use of loss mitigation, and evaluation of the mortgagor's income, credit and property.

24 CFR § 203.501.

> Duty to mitigate. Before four full monthly installments due on the mortgage have become unpaid, the mortgagee shall evaluate on a monthly basis all of the loss mitigation techniques provided at § 203.501 to determine which is appropriate.  Based upon such evaluations, the mortgagee shall take the appropriate loss mitigation action.  Documentation must be maintained for the initial and all subsequent evaluations and resulting loss mitigation actions. Should a claim for mortgage insurance benefits later be filed, the mortgagee shall maintain this documentation in the claim review file under the requirements of § 203.365(c).

24 CFR § 203.605(a).

> Before initiating foreclosure, the mortgagee must ensure that all servicing requirements of this subpart have been met.  The mortgagee may not commence foreclosure for a monetary default unless at least three full monthly installments due under the mortgage are unpaid after application of any partial payments that may have been accepted but not yet applied to the

mortgage account.  In addition, prior to initiating any action required by law to foreclose the mortgage, the mortgagee shall notify the mortgagor in a format prescribed by the Secretary that the mortgagor is in default and the mortgagee intends to foreclose unless the mortgagor cures the default.

24 CFR § 203.606(a).

Plaintiffs allege that the "good" or "service" at issue here is composed of correspondence received from Defendant:

That Defendant sent letters to Plaintiffs following their first missed payment advertising its performance of the loss mitigation services required by the HUD regulations.  Plaintiffs received at least the following letters from Defendant which were sent by Defendant knowing it would not perform and knowing it would not meet even close to the reasonably expected demand for services:

a. Plaintiffs received a computer generated form letter dated 06/07/10 that enclosed a pamphlet entitled "How to Avoid Foreclosure".  The pamphlet advertised such relief as Special Forebearance [sic], Mortgage Modification and Partial Claim and told them to call their lender.

b. Plaintiffs received a computer generated form letter dated 6/14/10 telling them they had "options" to avoid foreclosure and to "call immediately".

c. Plaintiffs received . . . computer generated form letters dated 7/06/10 and 8/2/10 telling them there were options available and to contact James Smith at Defendant's loss mitigation department.

d. Plaintiffs received unsigned flyers advertising "WE'RE HERE TO HELP!" and to "CALL TODAY AND YOU COULD RECEIVE THE LOWER PAYMENT OR ANOTHER MORTGAGE SOLUTION THAT YOU NEED" purportedly offering the help required by the contract.  These flyers were received bearing at least the following dates 10/28/10 and 12/28/10.

e. Plaintiffs received letters thanking Plaintiffs for their "recent inquiry" and encouraging them to use a "Workable Solutions Alternative" to, in "many instances" "avoid foreclosure".  The letters sent a detailed package called a "Workable Solutions" "Financial Statement" [sic] to complete and return to a designated address.  Plaintiffs received these unsigned letters bearing at least the following dates, 10/26/10 and 11/27/10.

*Third Am. Compl.* [#53] ¶ 35.

Aside from *Dawson v. Litton Loan Servicing, LP* (discussed more fully below), the undersigned is unaware of any Colorado or District of Colorado case addressing whether the circumstances presented in this case, i.e., alleged misrepresentation of loss mitigation offers, may form the basis for a CCPA claim, and the parties suggest none.  Moreover, *Dawson* does not directly address the issue of whether an offer of loss mitigation is a "good" or "service" under the CCPA.  The Colorado Supreme Court has recently reaffirmed that, where there is no Colorado case addressing a particular issue, including interpretation of the CCPA, the decisions of other jurisdictions should be examined for persuasive authority.  *LaFond v. Sweeney*, __ P.3d __, __, 2015 WL 333701, at *4 (Colo. Jan. 20, 2015) (citing *Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 54 (Colo. 2001) ("[I]n interpreting the CCPA it is helpful to examine other states' interpretations of their consumer protection statutes.").

Here, the parties direct the Court's attention to consumer protection acts enacted in Texas and Missouri.  *Motion* [#54] at 6 (citing *Gossett v. Fed. Home Loan Morg. Corp.*, 919 F. Supp. 2d 852, 861 (S.D. Tex. 2013)); *Response* [#56] at 3 (citing *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410 (Mo. 2014)); *Reply* [#57] at 6 (citing *Watson v. Wells Fargo Home Mortg., Inc.*, 438 S.W.3d 404 (Mo. 2014)).  In Texas, the Deceptive Trade Practices Act ("DTPA") requires an individual "to seek to acquire goods or services by purchase or lease" and "the goods or services acquired must form the basis of the party's complaint."  *Gossett*, 919 F. Supp. 2d at 861; Tex. Bus. & Com. Code § 17.45(4); *Kiper v. BAC Home Loans Servicing, L.P.*, 884 F. Supp. 2d 561, 572 (S.D. Tex. 2012) ("'A person seeking only the extension of credit and nothing more is not a consumer under the DTPA because the lending of money is not a good or service.'") (quoting *La Sara Grain Co. v.*

*First Nat. Bank of Mercedes*, 673 S.W.2d 558, 566-67 (Tex. 1984)); *Watson v. Aurora Loan Servs., LLC*, No. 4:11-CV-301-BJ, 2012 WL 3594233, at *6 (N.D. Tex. Aug. 21, 2012) (holding that the plaintiffs' search for a modification of an original loan does not satisfy the goods or services element of the DTPA).

The Missouri Merchandising Practices Act ("MMPA") makes the "act, use or employment by any person" of any unfair or deceptive practice done "in connection with the sale or advertisement of any merchandise" unlawful, and the use of an unlawful practice is a violation of the act "whether committed before, during or after the sale," as long as it was made "in connection with" the sale. *Conway*, 438 S.W.3d at 414. In *Conway v. CitiMortgage, Inc.*, the Missouri Supreme Court held that "[b]ecause a loan is an ongoing transaction, loan collection procedures, whether initiated by a loan originator or a loan servicer, are done 'in connection with' the original procurement of the loan." *Id.* at 416. Thus, unfair or deceptive acts stemming from loan servicing were prohibited by the MMPA. *Id.*

The CCPA employs more expansive language in its coverage of deceptive trade practices than either the Texas or Missouri statutes. In part, the CCPA provides:

> A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person: . . .
>
> (e) Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith; . . .
>
> (j) Advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity . . . .

Colo. Rev. Stat. § 6–1–105(e), (j); *Third Am. Compl.* [#53] at 15. The CCPA is Colorado's

version of the Uniform Deceptive Trade Practices Act and was deemed necessary, in part, to check "bait-and-switch" advertising practices. *Crowe v. Tull*, 126 P.3d 196, 202 (Colo. 2006) (citing *People ex. rel. Dunbar v. Gym of Am., Inc.*, 493 P.2d 660, 664-65 (1972)). The purpose of the CCPA is to provide "prompt, economical, and readily available remedies against consumer fraud." *Crowe*, 126 P.3d at 202 (quoting *W. Food Plan, Inc.*, 598 P.2d at 1041). The Colorado Supreme Court has taken an "expansive approach . . . in interpreting the CCPA by reading and considering the CCPA in its entirety and interpreting the meaning of any one section by considering the overall legislative purpose." *Crowe*, 126 P.3d at 202 (quoting *May Dep't Stores Co. v. State ex rel. Woodard*, 863 P.2d 967, 973 n.10 (Colo.1993)). "[I]n determining whether conduct falls within the purview of the CCPA, it should ordinarily be assumed that the CCPA applies to the conduct. That assumption is appropriate because of the strong and sweeping remedial purposes of the CCPA." *Crowe*, 126 P.3d at 202 (quoting *Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 53 (Colo. 2001)).

Plaintiffs assert that Defendant's actions and inactions, as follow, demonstrate Defendant's deceptiveness in connection with the service it offered:

> Plaintiffs reasonably relied on the misrepresentations and took the substantial effort and emotional energy to achieve a "[W]orkable Solution" as follows with the following corresponding results:
>
> a. Between May and August of 2010 when 24 CFR § 203.605 required Defendant to evaluate on a monthly basis all of the loss mitigation techniques provided at §203.501 to determine which is appropriate and to take the appropriate loss mitigation action, Plaintiffs repeatedly called Defendant asking for help. Defendant told Plaintiffs that it would send them necessary forms but they did not come. Defendant should have immediately evaluated Plaintiffs for a "Special Forbearance" for unemployment for which they qualified. Instead, on September 29, 2010, Defendant placed Plaintiffs in foreclosure having done absolutely nothing with their requests in violation of

24 CFR § 203.606 quoted above.

b. Plaintiff Sharon Christenson sent an undated letter about this time fully outlining the Plaintiffs' hardship and asking for help.  Defendant did nothing.

c. After September 29, 2010 Plaintiffs again called Defendant about loss mitigation and finally at least received a packet to complete.

d. In late 2010 Plaintiffs, having had no response on their own contacted professional help.  In December 2010 Plaintiffs and their professionals called Defendant who told them to obtain a loss mitigation packet from Defendant's website.  Between December 2010 and June 28, 2011 Plaintiffs repeatedly submitted requested loss mitigation documentation and applications. Defendant did not even acknowledge them but just persisted with foreclosure.

e. Plaintiffs repeatedly attempted to get Defendant's attention through its counsel, Susan Hendricks, of the firm of Aronowitz & Mecklenberg, through a CRCP 120 proceeding in state court between December of 2010 and June of 2011.  Still Defendant did not so much as acknowledge the applications. When Plaintiffs tried to raise the issue in the state court Rule 120 proceeding on March 31, 2011, Defendant successfully objected that loss mitigation was "beyond the scope of Rule 120" still not even acknowledging the applications.

f. Then on April 18, 2011, Plaintiffs' counsel sent a letter to Defendant's law firm, Aronowitz & Mecklenberg, fully outlining how Defendant was obligated to engage in loss mitigation outlining the language of the deed of the note, deed of trust, and the FHA regulations.  The letter was ignored.

g. Plaintiffs were required to file a Bankruptcy on June 28, 2011 to stop a sale of their home by Defendant.  Then they again submitted a loss mitigation packet, again not even acknowledged by Defendant.   Instead, of acknowledging and acting on the post-bankruptcy application, Defendant on August 16, 2011 filed an objection to Plaintiffs' proposed bankruptcy plan stating that even if Plaintiffs made their full mortgage payment that they were not paying the arrearage quickly enough under the proposed plan.

*Third Am. Compl.* [#53] ¶ 37.  Plaintiffs argue that these allegations show that "[t]he letters were all false in that Defendant had no intention of offering the services as advertised but were intended only to give the false impression of complying with their conditions under the note and deed of trust and the FHA regulations . . . ." *Id.* ¶ 36.

In *Dawson*, the District Judge found that the plaintiffs sufficiently pled this first element of a CCPA claim, based on the following:

> In their Complaint, Plaintiffs allege that: "Defendants, in the course of their business, misrepresented to Plaintiffs that they were complying with loss mitigation guidelines when it [sic] fact they were not but pretended to comply with loss mitigation guidelines while suppressing and failing to disclose the material fact that they were not." Further, Plaintiffs allege a pattern aimed at profiteering, which could lead to a conclusion of intent on the part of Defendants. These allegations sufficiently meet the unfair or deceptive practices element. Therefore, the Court finds that, if true, the deceptive trade practices described, and the reasonable inferences that can be drawn therefrom, plausibly mean that Defendants' dealings and communications were deceptive.

2013 WL 1283848, at *4 (internal citations omitted). These circumstances are nearly identical to the ones in the present case.

In consideration of the Colorado Supreme Court's instruction regarding interpretation of the CCPA and the persuasive authority of *Dawson*, the Court finds that Plaintiffs have sufficiently alleged a deceptive trade practice. By sending Plaintiffs multiple letters regarding loss mitigation and offers to explore options to avoid foreclosure, Defendant represented that it would provide this service to Plaintiffs. By allegedly failing to properly respond to Plaintiffs' repeated attempts to obtain this service from Defendant, the Court finds that Defendant may have "knowingly ma[de] a false representation as to the characteristics . . . , uses, [or] benefits . . . of services" and that Defendant may have "[a]dvertise[d] . . . services with intent not to supply reasonably expectable public demand . . . ." *See Third Am. Compl.* [#53] at 15 (citing Colo. Rev. Stat. § 6–1–105(e), (j)).

Accordingly, the Court finds that Plaintiffs have alleged an unfair or deceptive trade practice and therefore have sufficiently alleged the first element of a CCPA claim.

**C.      Whether the CCPA Claim Is a "Disguised" Breach-of-Contract Claim**

Although closely related to the foregoing two sections, the Court separately and briefly addresses Defendant's contention that Plaintiffs' CCPA claim is a "disguised" claim for breach of contract.  *Motion* [#54] at 7-8; *Response* [#56] at 4-6.

In determining the viability of Plaintiffs' CCPA claim as pled in the initial Complaint [#1], the undersigned found that "Plaintiffs' accusatory turn of phrase translates under the law as a mere allegation of an intent to breach a contract, and not of an intent to deceive." *Recommendation* [#30] at 35.  However, previous findings in this case by the District Judge and the allegations now asserted in the Third Amended Complaint mandate a different outcome here.  Defendant's alleged misrepresentations do not stem from a contractual obligation.  *See Order* [#34] at 15; *supra* § III.A.  Further, Plaintiffs have now alleged far more than a mere "pretext of compliance" on the part of Defendant.  *See supra* § III.B. Unlike the allegations construed in the previous Recommendation [#30], Plaintiffs' allegations now bring this claim out of the realm of contract law and under the auspices of the CCPA.  *Compare Dawson*, 2013 WL 1283848, at *4 (finding that Plaintiffs had pled sufficient facts to state a CCPA claim where Plaintiffs alleged similar facts to this case including actual misrepresentation and reliance on said deception)*, and Weigel v. BAC Home Loans Servicing, LP*, No. 09-cv-02546-RPM-KMT, 2011 WL 1135319, at *5 (D. Colo. Mar. 29, 2011) (finding deceptive practices where plaintiffs alleged that the loan provider had engaged in deceptive advertising practices), *with Gen. Steel Domestic Sales, LLC v. Hogan & Hartson, LLP*, 230 P.3d 1275, 1282 (Colo. App. 2010) ("The legislature did not intend for the CCPA to remedy circumstances in which a person merely fails to provide goods or services as promised.") *and Paul v. Tindell*, No. 02 CV 373, 2003 WL 24199540, at *5 (Colo. Dist. Ct. Apr. 2, 2003) (finding that, where no reliance or actual deception was

-17-

shown, the plaintiff's claim was more properly brought under contract law).

Accordingly, the Court finds that this argument fails as a matter of law.

## D.   Significant Public Impact

The Court next turns to Defendant's argument that Plaintiffs fail to allege a significant public impact. *Motion* [#54] at 8-9; *Response* [#56] at 6-7; *Reply* [#57] at 4-5.

The Colorado Supreme Court has established three factors to be considered in determining whether a challenged practice significantly impacts the public as consumers: (1) the number of consumers directly affected by the challenged practice; (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice; and (3) the evidence that the challenged practice previously had impacted other consumers or had significant potential to do so in the future. *Rhino Linings USA*, 62 P.3d at 146-47 (citing *Hall*, 969 P.2d at 235). No single factor is determinative. *One Creative Place, LLC v. Jet Ctr. Partners, LLC*, 259 P.3d 1287, 1290 (Colo. App. 2011) (noting that Colorado Supreme Court "decisions describe an analysis more akin to a balancing test than a checklist" when determining whether a party has sufficiently asserted a significant public impact under the CCPA).

Plaintiffs asserts the following significant impact on the public:

Plaintiffs plead on information and belief that the foregoing was just a portion of a large scale business practice of Defendant in Colorado and throughout the United States. Plaintiffs base this allegation, among other things, on the following.

a. The United States, 49 States, including Colorado, and the District of Columbia filed an historic enforcement action against Defendant and others in the United States District Court for the District of Columbia in Case No. 1:12-cv-00361-RMC. The good faith allegations signed by attorneys on behalf of the Plaintiffs including the Attorney General of Colorado alleged, inter alia, the following against "the Banks" which included this Defendant.

The Banks' Unfair, Deceptive, and Unlawful Loan Modification and Loss Mitigation Processes[:]

52. Under the States' consumer protection laws, the Banks are prohibited from engaging in unfair or deceptive practices with respect to consumers.

53. Pursuant to HUD regulations and FHA guidance, FHA-approved mortgage lenders and their servicers are required to engage in loss-mitigation efforts to avoid the foreclosure of HUD-insured single family residential mortgages.  E.g., 24 C.F.R. § 203.500 et seq.; Mortgagee Letter 2008-07 ("Treble Damages for Failure to Engage in Loss Mitigation") (Sept. 26, 2008); Mortgagee Letter 1996-25 ("Existing Alternatives to Foreclosure -- Loss Mitigation") (May 8, 1996).  Thus, when acting as a servicer, the Banks were required to refrain from foreclosing on any FHA insured mortgage where a default could be addressed by modifying the terms of the mortgage or other less-costly alternatives to foreclosure were available.

54. Under the Treasury's various rescue and stimulus programs, the Banks received monetary incentives from the Federal government in exchange for the commitment to make efforts to modify defaulting borrowers' single family residential mortgages.  See, e.g., Making Home Affordable Handbook v.1.0, ch. 13 ("Incentive Compensation") (Aug. 19, 2010).  Under the programs, the Banks agreed to fulfill requirements set forth in program guidelines and servicer participation agreements.

55. Each of the Banks regularly conducts or manages loan modifications on behalf of the entities that hold the loans and mortgages and that hired the Banks as servicers.

56. In the course of their servicing and oversight of mortgage loans, the Banks violated federal laws, program requirements and contractual requirements governing loss mitigation.

57. In the course of their conduct, management and oversight of loan modifications in the plaintiff States, the Banks have engaged in a pattern of unfair and deceptive practices.

58. The Banks' failure to discharge their required loan modification obligations, and related unfair and deceptive practices, include, but are not limited to, the following:

b. failing to gather or losing loan modification application documentation and other paper work;

c. failing to provide adequate staffing to implement programs;

d. failing to adequately train staff responsible for loan modifications;

e. failing to establish adequate processes for loan modifications;

f. allowing borrowers to stay in trial modifications for excessive time periods;

g. wrongfully denying modification applications;

h. failing to respond to borrower inquiries;

i. providing false or misleading information to consumers while referring loans to foreclosure during the loan modification application process;

j. providing false or misleading information to consumers while initiating foreclosures where the borrower was in good faith actively pursuing a loss mitigation alternative offered by the Bank;

k. providing false or misleading information to consumers while scheduling and conducting foreclosure sales during the loan application process and during trial loan modification periods;

l. misrepresenting to borrowers that loss mitigation programs would provide relief from the initiation of foreclosure or further foreclosure efforts;

m. failing to provide accurate and timely information to borrowers who are in need of, and eligible for, loss mitigation services, including loan modifications;

n. falsely advising borrowers that they must be at least 60 days delinquent in loan payments to qualify for a loan modification;

o. miscalculating borrowers' eligibility for loan modification programs and improperly denying loan modification relief to eligible borrowers;

> p. misleading borrowers by representing that loan modification applications will be handled promptly when Banks regularly fail to act on loan modifications in a timely manner;
>
> q. failing to properly process borrowers' applications for loan modifications, including failing to account for documents submitted by borrowers and failing to respond to borrowers' reasonable requests for information and assistance;
>
> r. failing to assign adequate staff resources with sufficient training to handle the demand from distressed borrowers; and
>
> s. misleading borrowers by providing false or deceptive reasons for denial of loan modifications."

b. Then in Paragraph 64 under heading "3. Wrongful Conduct Related to Foreclosures" the same complaint alleges: The Banks' (again including Defendant) failure to follow appropriate foreclosure procedures, and related unfair and deceptive practices include, but are not limited to, the following:

> h. inappropriately dual-tracking foreclosure and loan modification activities, and failing to communicate with borrowers with respect to foreclosure activities."

c. On or about March 12, 2012, Defendant entered into an historic consent judgment in the foregoing Case No. 1:12-cv-00361-RMC Defendant requiring the payment of over three trillion dollars in settlement funds.  It further agreed to submit to supervision on the areas of loss mitigation and the prohibition on dual tracking.

*Third Am. Compl.* [#53] ¶ 38.

Examining the *Rhino Linings USA* factors, the Court first notes that the Third Amended Complaint does not provide any concrete number regarding how many consumers have been affected by Defendant's alleged loss-mitigation misrepresentations. However, Plaintiffs do allege that Defendant "is engaged in the business of servicing FHA mortgages of a large number of consumers in Colorado" and that "Defendant, in accord with its agreement with FHA, entered into thousands of direct agreements with Colorado

-21-

consumers . . . agreeing to perform loss mitigation functions as a condition of acceleration and foreclosure . . . ."  *Third Am. Compl.* [#53] ¶¶ 32-33.  Plaintiffs do not separately address "the relative sophistication and bargaining power" of the affected consumers, but Plaintiffs do appear to allege that Defendant's efforts are primarily directed at "single family residential mortgages," which generally seems to indicate consumers of normal sophistication with little bargaining power.  *Id.* ¶ 38(a)(54).  Regarding the third factor, i.e., "the evidence that the challenged practice previously had impacted other consumers or had significant potential to do so in the future," Plaintiff provides evidence of a now-settled lawsuit filed in the District of Columbia on behalf of forty-nine states including Colorado against Defendant and others regarding their alleged deceptive practices including failure to engage in proper, required loss mitigation actions.  *Id.* ¶ 38.  There is no indication in the Third Amended Complaint that Defendant has altered its alleged illegal practices since that time so as to mitigate their impact on consumers in the future.  These factors all militate in favor of finding a significant public impact.

In *Dawson*, the District Judge found that Plaintiffs sufficiently alleged this element of a CCPA claim:

> As alleged in the Complaint, Defendants' deceptive trade practices could significantly impact the public as actual or potential consumers of Defendants' loan services.  Plaintiffs claim that Defendants have an extensive presence in Colorado as a large residential mortgage servicer with a "substantial number of consumers."  They allege that Defendants' conduct was aimed at statewide profiteering and was "mechanical."  Inherent in the HAMP application procedures, the consumers of loan services have little-to-no bargaining power, in that they must accept the procedures or face default.  Given these factual assertions, which for purposes of the instant motion the Court accepts as true, the Court finds that Plaintiffs' allegations are sufficient to meet the public impact element of a CCPA claim.

*Dawson*, 2013 WL 1283848, at *5 (internal citations omitted).  Although the allegations in

*Dawson* were presented slightly differently from the allegations in the present case, they pertain to the same type of practices.

"[T]o constitute the public impact contemplated by the CCPA, the challenged practice must significantly impact the public." *Brodeur*, 169 P.3d at 156 (citing *Crowe*, 126 P.3d at 204 ("The crux of a CCPA claim is a deceptive trade practice, which, by definition, must be intentionally inflicted on the consumer public."); *Hall*, 969 P.2d at 234 ("The CCPA regulates practices which because of their nature, may prove injurious, offensive, or dangerous to the public.")).   Such is the nature of the present case, which differs significantly from other CCPA cases where no public impact was found. *See, e.g.*, *Rhino Linings*, 62 P.3d at 150 (holding that there was no significant public impact where franchisor's widespread advertising contained no deception); *Martinez v. Lewis*, 969 P.2d 213, 220-21 (Colo. 1998) (holding that there was no significant public impact when alleged deceptive practices occurred solely in the context of a private agreement to provide services); *Brodeur v. Am. Home Assur. Co.*, 169 P.3d 139, 155 (Colo. App. 2007) (holding that the mere public nature of the workers' compensation insurance program was insufficient to demonstrate a significant public impact under the CCPA).

Accordingly, the Court finds that Plaintiffs' allegations are sufficient to meet the factors articulated in *Rhino Linings* for the public impact element of a CCPA claim. *See Dawson*, 2013 WL 1283848, at *5.

**E.    Injury to Legally Protected Interest**

Plaintiffs allege several injuries resulting from Defendant's alleged failure to engage in loss mitigation:

Because of Defendant's direct representations to them, Plaintiffs were

deceived into thinking they could receive fair loss mitigation treatment and they spent substantial time, energy and emotion into submitting loss mitigation paperwork. Further it caused them to hire professionals to assist them that were a collateral source due to their other business dealings and acquaintance with Plaintiffs and Defendant is responsible for the reasonable value of those services. Further, Plaintiffs suffered very severe emotional distress and mental anguish which is excruciating and a significant and a real injury for their involvement in this rigged process. Further, as a proximate result thereof, Plaintiff Sharon Christianson has developed a condition known as shingles in that the disease is caused by a weakened immune system and stress weakens the immune system. In this case the stress was truly excruciating. Further, as a result of the injuries to Plaintiff Sharon Christenson, Plaintiff Eugene Christenson lost the comfort, support and consortium of his wife.

Because of Defendant's false representations, Plaintiffs and others were induced to participate in a rigged loss mitigation process by submitting applications and documents Defendant had no intention of considering. The existence of the deceptive business practice provided Defendant with a large bank of documentation submitted by consumers which allowed Defendant to foreclose on homeowners, en masse, without complying with the regulations, but giving the appearance that it did in order to hide the noncompliance from HUD and avoid HUD interference. Because of the foreclosure mill facilitated by these applications, Defendant was in turn able to set up a foreclosure sale on Plaintiffs' property for June 29, 2011 before Plaintiffs were ever evaluated for loss mitigation, forcing Plaintiffs to file an otherwise unnecessary bankruptcy in June 28, 2011. Further, Plaintiffs were required to fight objections to their Chapter 13 bankruptcy plan based upon the failure to provide for payment of arrearages fast enough for Defendant on top of the mortgage payments. As a result, Plaintiff sustained legal fees in their Chapter 13. Further, Plaintiffs have been forced to make high payments on their mortgage during their Chapter 13 plan. As a result of the foregoing, Plaintiffs sustained additional loss of their quality of life and very severe emotional distress and mental anguish which is excruciating and a significant and a real injury. . . .

*Third Am. Compl.* [#53 ¶ 41.

In *Dawson*, the defendants made a similar argument to the one asserted by Defendant here, i.e., that "the damages suffered by Plaintiffs were not due to Defendants' alleged deceptive practices but, rather, were due to Plaintiffs' own default on their loan." 2013 WL 1283848, at *5. The District Judge found that the following allegations were

sufficient to meet this element of a CCPA claim:

> These injuries include putting Plaintiffs further behind on their debts and their budgeted money toward other expenses, such as the escrow account, and the loss of other economic benefits of the loan modification.  Additionally, Plaintiffs point to the actual foreclosure, which they allege could have been avoided via loss-mitigation efforts.  That is enough to sustain a claim of injury.  Further, Plaintiffs allege "severe emotional distress" in addition to the financial injury.  Plaintiffs state the emotional injury resulted from the threat of losing their home.

*Id.* (internal citations omitted).  Plaintiffs here make many of the same allegations.  *Third Am. Compl.* [#53] ¶ 41.  These allegations are sufficient to sustain a claim that real injury has occurred.  *Id.* (citing *Rule v. Fort Dodge Animal Health, Inc.*, 607 F.3d 250, 255 (1st Cir. 2010) (holding any economic injury would have been sufficient to show damages)).

Accordingly, the Court finds that Plaintiffs have met this element of a CCPA claim.

**F.    Detrimental Reliance**

Finally, Defendant argues that "Plaintiffs do not allege that, in reliance on [Defendant's] statements, Plaintiffs did or refrained from doing anything that adversely affected the state of affairs that existed prior to the alleged misrepresentations." *Motion* [#54] at 9.  Although Defendant does not frame it as such, the argument appears to go directly to the fifth element of a CCPA claim, i.e., that the challenged practice caused Plaintiffs' injury.  *Rhino Linings USA, Inc.*, 62 P.3d at 146-47.

"Reliance often provides a key causal link between a consumer's injury and a defendant's deceptive practice." *Garcia v. Medved Chevrolet, Inc.*, 263 P.3d 92, 98 (Colo. 2011).  "[A] consumer was harmed by a defendant's violation of the CCPA if that consumer had been exposed to defendant's deceptive practice and had undertaken activities in reliance on that deceptive practice." *Id.* (citing *May Dep't Stores Co.*, 863 P.2d at 973-74).

For example, in *Crowe v. Tull*, the Colorado Supreme Court held that "the plaintiff could demonstrate causation based on the theory that 'reliance on the [attorney's misleading] advertising was the first link in a chain that led to' the plaintiff's injury." *Garcia*, 263 P.3d at 98 (quoting *Crowe*, 126 P.3d at 210).

Defendant argues that "Plaintiffs merely allege that they expended resources towards loss mitigation, which Plaintiffs would have had to have done regardless of Defendant's alleged representations." *Motion* [#54] at 10. Defendant's circular argument is without merit, however. If Defendant had made no misrepresentations and fulfilled the service it offered, then Plaintiffs' expenditures may have been successful and, at a minimum, not led to Plaintiffs' alleged damages. If Plaintiffs had known that Defendant was misrepresenting its dedication to engage in appropriate loss mitigation, Plaintiffs would not have expended the resources they did in trying to obtain this service. In other words, Plaintiffs have alleged that they relied on the veracity of Defendant's representations regarding its loss mitigation services, and they were injured as described in Section III.E. above.

Accordingly, the Court finds that Plaintiffs meet this element of a CCPA claim.

### IV.  Conclusion

Accordingly, the Court respectfully **RECOMMENDS** that the Motion [#54] be **DENIED**.

IT IS HEREBY **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is

-26-

assigned.  A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).  A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review.  *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).


Dated:  February 20, 2015

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge